## Chesapeake & Ohio Railway Company v. City of Dayton, et al.

(Decided October 30, 1917.)

### Appeal from Campbell Circuit Court.

1.  Railroads—When Estopped to Deny Existence of Street over Which Tracks are Run.—Where an ordinance giving the right of way

through a city to a railroad company named streets over which the right of way was granted, and under the ordinance the railroad company laid its tracks, it will be estopped in a controversy with the city as to the restoration of a street to raise the question that the street ordered by the city to be restored was not a street at the time the railroad was constructed. .

2. Contracts—Performance of—Remedy of One Party Where Other Has Put it Out of His Power to Perform the Contract.—Where one of the parties to a contract has by his own act put it out of his power to perform the contract according to its terms, the other party may have a suit in damages for a breach of the contract, or may in a court of equity compel the defaulting party to perform the contract in such a way as will carry out the purpose of the contract, although this may cost the defaulting party more than the doing of the work under the original contract would have cost.

3. Railroads—Contracts—Railroad May be Compelled to Build Overhead Bridge When it Has Put it Out of Its Power to Conform Grade of Street to Track as Contracted.—Where a railroad company agreed in an ordinance contract to conform a street to the grade of the track, and it put it out of its power to do this by making a deep cut, it may be compelled by the city to erect an overhead bridge.

4. Railroads—Contracts—Between Railroad and City Created by Ordinance—Enforcement of.—Where an ordinance, which was accepted by the railroad company, gave it the right to construct tracks across the streets of a city, the ordinance constituted a contract between the city and the company, and a court of equity had the power to compel performance by the company.

GALVIN & GALVIN and W. A. BURKAMP for appellant.

GEORGE J. HEROLD and E. E. KELLY for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In November, 1914, the board of council of the city of Dayton enacted an ordinance requiring all railroad companies operating lines of railroad through the city of Dayton and crossing Clark and Boone streets and O'Fallon avenue, in said city, "to conform the grade of said railroad to the grade of each of said streets and avenue at said crossings, or to provide and maintain a suitable passway under, or bridge over, its tracks at each of said street and avenue crossings, suitable for public use on said streets by persons walking, riding or driving along said streets and avenue across said railroad tracks."

And in September, 1914, the board of council of the city of Bellevue enacted an ordinance requiring the rail-

way company to "restore O'Fallon avenue, as near as
may be practicable, to its former usefulness, or place
same in such a condition as will make it safe and con-
venient for travel and use as a street."

The railway company failing and refusing to comply
with these ordinances, the cities of Bellevue and Dayton,
in August, 1915, filed a joint suit against the company,
averring that O'Fallon avenue was a public way, 60 feet
in width, running north and south, and lying partly in
the city of Bellevue on the west and the city of Dayton on
the east; that 30 feet of the width of this avenue was
within the corporate limits of Bellevue and 30 feet within
the corporate limits of Dayton; that the Elizabethtown,
Lexington & Big Sandy R. R. Co., when it constructed
its line of railroad running east and west through these
cities in 1886 or 1887, for the purpose of crossing O'Fal-
lon avenue with its tracks, made a cut in the avenue 60
feet wide and 17 feet deep, and this cut remained sub-
stantially as it was when the road was constructed; that
the Chesapeake & Ohio Ry. Co. was the successor in title
to the Elizabethtown, Lexington & Big Sandy R. R. Co.;
that the population of these two cities was about 14,000,
and the territory along O'Fallon avenue both north and
south of the railroad tracks was thickly populated; that
this avenue was traveled by several hundred pedestrians
and many vehicles each day, and that pedestrians and
vehicles desiring to go from a point on the avenue north
or south of the railway track to a point on the other side
of the railway were obliged to leave the avenue when or
before they came to the place at which it was crossed by
the railroad tracks, and go to other streets for the pur-
pose of crossing the tracks, as the tracks at O'Fallon
avenue could not be crossed by either pedestrians or ve-
hicles on account of the deepness of the cut in which the
tracks were laid; that on account of the cut it was im-
possible for either the railroad tracks to be brought to
the same grade as O'Fallon avenue or O'Fallon avenue
to be brought to the same grade as the railroad tracks,
and therefore the only way by which the tracks at O'Fal-
lon avenue could be crossed was by the erection of an
overhead bridge at the crossing; that the company had
been frequently requested to either restore O'Fallon ave-
nue to its original grade or to erect a suitable bridge, but
had failed to do either, and they prayed that the com-
pany be required to make a suitable overhead bridge for

pedestrians and vehicles at the point where the tracks crossed O'Fallon avenue.

To this petition the railway company filed an answer denying that O'Fallon avenue was dedicated or open or in use as a public street by either of the cities at the time of or prior to the enactment of the ordinances giving to the Elizabethtown, Lexington & Big Sandy R. R. Co. the right of way through the cities. It also put in issue all the material averments of the petition.

After the pleadings had been made up, some evidence was taken by depositions, and the case being submitted, there was a judgment directing the railway company to "construct and maintain an overhead bridge or crossing and necessary approaches thereto, all not less than 30 feet in width, suitable for pedestrians and vehicles, to pass along O'Fallon avenue, equally in the cities of Bellevue and Dayton and over the tracks and right of way of the said company, and to commence the construction thereof on or before the 15th day of August, 1917, and to complete the construction thereof on or before June 1, 1918."

From this judgment the railway company prosecutes this appeal, asking a reversal on several grounds, the more important of which will be later noticed.

At the very outset it may be said that there is no dispute about the following facts: that when the tracks of the railroad were laid in 1886 or 1887 the public way now known as O'Fallon avenue was unimproved, but since that time it has been improved by the cities of Dayton and Bellevue on both sides of the railroad tracks; that the population of Bellevue and Dayton and vicinity is about 14,000, and several hundred people and a great many vehicles travel each day on this avenue, but cannot travel it across the railroad tracks on account of the steep embankments on each side of the track, and consequently travelers and vehicles desiring to go from that part of O'Fallon avenue north of the tracks to a point on the avenue south of the tracks, must make a detour to other streets, and so as to travelers desiring to go from the south of the tracks to the north of them; that the embankments made by the cut through O'Fallon avenue in which the tracks are laid are about 8 feet high on one side and 18 feet on the other, the cut being about 35 feet wide at the bottom and 60 feet at the top; that on account of the depth of the cut it is not practicable to cut down O'Fallon avenue on either side to a level with the tracks

or practicable to raise the tracks to conform to the surface grade of the avenue; that before the cut was made and the tracks laid, the surface of O'Fallon avenue at this point was practically on a level with the surface on other parts of the avenue; that the only practicable or feasible way by which O'Fallon avenue where it is crossed by the tracks can be opened to the public is by means of an overhead bridge, the cost of which is variously estimated at from $12,000.00 to $43,000.00; that between 35 and 50 trains a day use the tracks at this point.

The first contention of counsel for the railway company, and it is a material one, is that there was no such public way as O'Fallon avenue either in Dayton or Bellevue at the time its predecessor was granted the right to lay its tracks through these cities and across the land now known as O'Fallon avenue; that this land at that time was open, unimproved and in cultivation for farm purposes and had never been recognized as a public way by either of these cities or dedicated to either of them or accepted as an avenue or public way by either of them, although it is conceded that a good many years ago, and since the construction of the railroad, the territory known as O'Fallon avenue has become a public way of each of the cities, one-half of it lying in each.

It may here be said that the record does not show how either the cities of Dayton or Bellevue acquired the ground now occupied by O'Fallon avenue, but it is a fact that in the ordinance enacted by the city of Bellevue in 1886 granting to the predecessor of the appellant railway company the right to lay its tracks in the city, O'Fallon avenue was recognized as one of the public ways of the city by a section providing that "Said company shall have the right to raise the grade between and including O'Fallon and Washington avenues ten feet above the present surface of the ground and streets as they now are, and to regrade and finish all streets, leaving them in as good condition as they are at the present time. This is done to permit the company to cross all streets below grade."

And in the ordinance adopted in 1887 granting the right to construct the railroad through Dayton, O'Fallon avenue was recognized as one of the public ways of the city in a section of the ordinance describing the right of way granted the railroad company, which section

names the streets it may cross, among them being
"O'Fallon avenue."

So that the very ordinances under which the railroad
company was granted a right of way through these cities
recognized the existence in each of them of the public
way then and now known as O'Fallon avenue, and the
railroad company when it accepted the privileges and
benefits of these ordinances by constructing its railroad
through these cities and across the streets named in the
ordinances, including O'Fallon avenue, recognized that
O'Fallon avenue was then one of the public ways of each
of the cities, and secured from each of the cities the
right to construct its railroad across it. Under these cir-
cumstances we think the railway company cannot now
question the fact that O'Fallon avenue was then a pub-
lic way of the cities of Dayton and Bellevue, and as much
under the control of these cities as any of the other streets
over which the railroad company was given the right to
construct its tracks. It is not important whether O'Fal-
lon avenue was at that time an improved way or not. The
only material inquiry is, was it then a public way of these
cities?

When the railroad company wanted a right of way
from the cities across their streets and public ways, it
conceded that O'Fallon avenue was a public way of
and under the control of the cities, and such a public
way as they had authority to grant it a right of way over;
and having thus sought and obtained from the cities the
right to cross this avenue, it should not, after it has oc-
cupied it for many years under and by virtue of such
authority and consent, be heard to say that it was not
at that time a public way of these cities. In other words,
we think that when a railroad company asks and obtains
from a city the right to cross certain named streets with
its tracks and does so, it will thereafter be estopped to
say that the streets were not public ways of and under
the control of the city, when it is admitted that no other
person is challenging the fact that the streets at the time
were public ways of and under the control of the city
and have so remained. A railroad company cannot take
and hold a street under a grant from a city and after-
wards, in a controversy between it and the city, deny that
it was a street, when every person interested, or who
might draw the grant of the city in question, agrees that
it was when the grant by the city was made, and has so
remained. If O'Fallon avenue was a public way when

the right was granted, there can be no doubt that it has so continued, as there is no pretense that it has ever been abandoned. Nor does the fact, that when the right of way ordinance was granted this avenue was unimproved and remained in such unimproved condition for many years, divest it of its character as a public way.

Upon this point what was said in City of Henderson v. Yeaman, 169 Ky. 503, is pertinent. In that case the question was raised by Yeaman whether a public way known as Dixon street, which had been set apart as a street in 1797, but never improved by the city or any property owners, should be treated as one of the streets of the city, and the court said: ''But the mere fact that the city failed to improve the street, or its non-user by the public, did not work an abandonment of it as a street. When streets are set apart and dedicated to the public use, and a town or city is built on the ground so laid off for this purpose, the city authorities are not required to take physical possession or control of each street, or to improve it in order to save their right to reclaim it against any person who undertakes to hold it adversely. Nor is there any period fixed by statute or judicial ruling in which a street so dedicated must be taken possession of by the city or improved by it in order to prevent an abandonment. The city may delay manifesting its acceptance by control and improvement as long as it pleases. It may wait until the needs of the public or the city require its improvement.''

So that, treating O'Fallon avenue as one of the public ways of Dayton and Bellevue at the time the railroad was constructed and since, we will now look to the ordinances passed by these respective cities granting the predecessor of the present railway company the right to construct its road through these cities and across the streets thereof for the purpose of ascertaining what contract duties and obligations it assumed in consideration of the right given to it.

In the ordinance adopted by the city of Bellevue it was provided that ''Said company shall conform as near as may be practicable to the grade of the several streets in said town over which the track of said company passes; and said company, upon completion of its track or tracks, or switch or switches, through or over any street or alley in said town, shall, immediately thereafter, restore such street or alley, or any street or alley affected thereby, if the same be improved, to as good condition

as it was in before said work was done, and shall perpetually after the completion of such track or switch, maintain in good repair all said parts of said streets and alleys which may be between the rails of its tracks and switches, and shall also maintain said streets and alleys in good repair for a space of three feet on the outside of said rails, and if any street or alley upon which it may lay its rails, shall not at said time be improved by grading, curbing and macadamizing, or by either, said company shall, when said street or alley may be improved, pay for so much of said work as shall lay within three feet of the outside of its rails, and shall, at its own expense, improve between the rails, as nearly as practicable, in accordance with the improvements of said street or alley, as ordered by the board of trustees of said town, provided that this shall not release said company from paying for its proportion of the expense for improving any street or alley where such company owns any lot or lots abutting on any such street or alley so improved, or to be improved as other property holders are required to pay.''

And in the ordinance enacted by the city of Dayton it was provided that ''The grade of said road and switches is to conform as near as practicable to the grade of said streets as established, and said company upon completion of its track or tracks, switch or switches, through or over any street or alley, shall immediately thereafter restore said street or alley to the condition it was in before said work was done, and when the established grade of a street or alley does not conform to the grade of the railroad, the company shall make the necessary change of grade in the street or alley and shall repave the same and reset the curbs if on an improved street, and shall make the grade of unimproved streets conform to the grade of the railroad by cutting or filling as may be necessary, and shall perpetually thereafter maintain in good repair all said parts of streets and alleys which may be between the rails of its said tracks and switches, also two feet on the outside of tracks and all crossings to be filled on the outside and inside with oak planks, and they shall keep all streets that are hereafter made in good repair between tracks.''

Considering O'Fallon avenue as being at that time an unimproved street, it will be observed that the Bellevue ordinance provided that ''If any street or alley upon which it may lay its rails, shall not at said time be im-

proved by grading, curbing and macadamizing, or by either, said company shall, when said street or alley may be improved, pay for so much of said work as shall lay within three feet of the outside of its rails, and it shall, at its own expense, improve between its rails, as nearly as practicable, in accordance with the improvements of said street or alley, as ordered by the Board of Trustees of said town." And in the ordinance enacted by the city of Dayton it was provided that the company "shall make the grade of unimproved streets conform to the grade of the railroad by cutting or filling as may be necessary."

It will also be observed that each of these ordinances contemplated that the company should conform its tracks as nearly as practicable to the grade of the several streets over which the tracks of the company passed and should restore the streets to as good condition as they were before the road was constructed. This obligation to restore the streets the railroad company assumed in consideration of the grant of the right of way, and, plainly, it was never intended by these ordinances, or in the minds of any of the parties to the contract rights and obligations specified therein, that the railroad company might destroy the public use of any of the streets or public ways of the city then improved or that might be thereafter improved by making either cuts or fills that would render at any time the streets or ways impassable for the use of the traveling public. It cannot be seriously contended that either of these ordinances permitted or authorized the railroad company to do anything like this. It was carefully provided in the ordinances that the grade of the streets and public ways and the grade of the railroad should so conform to each other as to permit the use of the streets and ways in the same manner as if the railroad had not been constructed, and this condition applied to unimproved streets when they should be improved.

As to unimproved streets, the duty the railroad company was under to conform as nearly as practicable the grade of its roadbed to the grade of the streets was merely postponed until they were improved. The railroad company assumed the same duty and liability as to the unimproved streets when they were placed in an improved state as it was required to and did assume as to improved streets at the time the road was constructed.

It is, however, undisputed that the railroad company, in constructing its road across O'Fallon avenue, left it in such condition as that it could not be used by the public, and in such condition as that the grade of the street could not be leveled to the grade of the railroad. But at that time and for some years thereafter the cities did not complain about it because the public use of O'Fallon avenue was not of sufficient moment to make it a matter of any consequence whether it was obstructed or not. But now that it has become a matter of public interest that the obstruction shall be removed and the avenue restored to a condition that will enable the public to freely use it, the railway company contends that it should not be required to make the necessary improvements; or, in other words, should not be required to perform its contract obligation, and this upon the ground that the ordinances granting the right of way did not make provision for overhead bridges across this avenue.

It seems to us that a sufficient answer to this contention is that as the railway company, or its predecessor, in whose place it stands, put it out of its power to allow the grade of the street to be made to conform to the grade of the track as provided in the ordinances, it must do the next most practicable thing to carry out the purpose of the ordinances, and that is restore the avenue where its tracks cross as nearly as circumstances will permit to the condition contemplated by the ordinances, so that the avenue may be used where it crosses the tracks, and under the evidence this can only be done by constructing an overhead bridge.

The railway company cannot keep the rights granted by the ordinances and refuse to perform the consideration upon which these rights were granted. It assumed the burdens as well as the benefits attaching to the grants and will not be heard to say that as it cannot perform its part of the contract according to the terms of the ordinances, due to the fact that it made a deep cut across the avenue, it is absolved from the duty of making the avenue passable. When this contract was entered into the railroad company must have anticipated that at some time O'Fallon avenue would be an improved street in use by the public, and it committed a breach of the contract when it put this avenue in such condition as that it could not when improved be freely used by the public.

Now, as to the remedy: It is an elementary principle in the law of contracts that when one of the parties

voluntarily puts it out of his power to do what he agreed
to do, he cannot, when it is sought to make him perform
his contract, respond that the other party can have no
relief because it is not practicable or possible to perform
the contract according to its terms. Poirier v. Gravel,
88 Cal. 79; Smith v. Jordan, 13 Minn. 264; Lovering v.
Lovering, 13 N. H. 513; Elliot on Contracts, vol. 3, sec.
2108; Bishop on Contracts, sec. 1426. When a situation
like this arises the party who, by his voluntary act, has
put it out of his power to fulfill the terms of the contract,
may be compelled by appropriate action to either respond
in damages for his breach or, if the other party is will-
ing, may in a court of equity be compelled to perform the
contract in some practicable way that will be satisfactory
to the other party and at the same time will carry out the
purpose and spirit of the contract.

Supporting these views is the case of Greenup County
v. Maysville & Big Sandy R. R. Co., 88 Ky. 659. In that
case the railroad company agreed in its charter to re-
store any road or highway that it crossed to its former
state, or to put it in such condition as not to destroy its
usefulness. The railroad company in the construction
of its road failed and refused to restore one of the county
roads to the condition prescribed by the charter, and
thereupon the county brought suit to recover damages
and to compel the railroad company to perform the con-
ditions prescribed in its charter. In sustaining the right
of the county to maintain such an action, the court said:

"The right of a railroad to cross a highway does not
authorize a material interference with the public travel.
If, by reason of excavations and erections and changes
in the surface it of necessity temporarily occurs to some
extent, it is the duty of the company to so far restore
it to its former condition as not to interfere materially
with its usefulness to the public. It must be made safe
and reasonably convenient for travel. A restoration to
its former surface level or elevation is not, of course, re-
quired, but to its former passable condition and safe use
by the public."

Again, in Louisville Southern R. R. Co. v. Board of
Trustees, 17 Ky. L. R. 780, the court had before it the
construction and enforcement of a contract between the
city and the railroad company involving the right to re-
quire the railroad company to restore a street that it
crossed to its former condition by either conforming the

grade of the street to the grade of the railroad or by erecting an overhead bridge, and the court said:

"The town gave the use of the street upon the appellant's undertaking to construct and maintain at all intersections of streets proper crossings, and, as far as practicable, to conform the grades of defendant's tracks to the established grades of the streets. This was a condition upon which the use of the streets was granted, and the failure of the company to comply with its undertaking and obstructing the street or its use at this crossing near the branch gave to the city a cause of action in equity to compel the performance of the contract. . . . The chancellor should compel the railroad company to restore the street to its former usefulness as near as practicable, or place it in such a condition as will make it safe and convenient for travel and use as a street. . . . If by its act a bridge is necessary to accomplish this purpose, it is the duty of the appellant (railroad company) to build one."

It is, however, insisted by counsel for the railway company that as the ordinances put upon it only the duty of paying for so much of the work necessary to the restoration of any street that it crossed as was between the rails of the track and three feet on the outside thereof, it should only be required to contribute such proportion of the cost of an overhead bridge as was represented by the distance between its tracks and three feet on each side thereof and the total length of the bridge. But we do not see our way clear to accept this view of the matter. If the railway company had complied with the letter and the spirit of the ordinances by conforming its tracks to the grade of the streets, then the provisions of the ordinances would regulate and limit its duty in respect to the construction and repair of the streets, and the fact that the tracks were laid across the avenue would have imposed little or no additional cost on the cities. In fact, it would have relieved them of the cost of constructing and maintaining the street to the extent of the width of the tracks and three feet on each side thereof; but, as we have said, the railway company by its voluntary act put it out of its power to do what it agreed to do in the ordinances and also put it out of the power of the cities to keep this avenue, where it was crossed by the tracks, open for public use in the manner contemplated by the ordinances.

This being the situation in which the parties have been put by the railway company's violation of the ordinances, we think that it cannot require the cities to pay any part of the cost that may be incurred in the erection of a bridge. To do this would enable the railway company by its breach of the contract to put the cities to a large expense that otherwise they need not have incurred and an expense that the ordinances did not contemplate they should assume.

Treating this case as one arising purely in contract, where one of the parties to the contract is seeking to compel the other to perform his contract, we have no difficulty in coming to the conclusion that the court had the power to enter the judgment that it did. This view of the case has also made it entirely unnecessary for us to consider the powers of the cities under the statute or the common law in respect to matters like this or take any notice of the many cases on this subject to which our attention has been called.

The lower court required the railway company to commence the construction of the bridge on or before the 15th of August, 1917, and to complete it on or before June 1, 1918. But the delay occasioned by the appeal has made it necessary that this time should be extended, and so on a return of the case the judgment should be modified so as to direct the company to commence the construction of the overhead bridge on or before January 1, 1918, and complete it on or before August 1, 1918.

Wherefore, the judgment is affirmed.