D. W. BATES, Superintendent of Banking of the State of Iowa, Receiver of the AMERICAN SAVINGS BANK & TRUST COMPANY, of Burlington, Iowa, v. AMOS W. DANA, JENNIE DANA, JOHN HOERR, and ROSE HOERR, Respondents, ANNA SELLNER, Appellant.—133 S. W. (2d) 326.

Division Two, November 22, 1939.

*Boudreau & Kramer* for appellant.

312

*Charles C. Clark, John L. Plowman* and *Elgin T. Fuller* for respondent.

BOHLING, C.—This is a controversy between mortgagees. The Superintendent of Banking of the State of Iowa and Receiver of the American Savings Bank and Trust Company, of Burlington, Iowa (hereinafter referred to as the Bank), instituted the action against Amos W. Dana, Jennie Dana, Anna Sellner, John Hoerr and Rose Hoerr, seeking, broadly stated, a judgment foreclosing the rights of said Danas, mortgagors, and defendant Sellner in and to certain real estate to discharge an indebtedness due said Bank; the appointment of a receiver pending the sale, and the reinbursement to plaintiff of $4,574.44 advanced to discharge tax liens against said real estate. Constructive service was had on the Danas. John and Rose Hoerr, husband and wife, were tenants on the land. Anna Sellner, a resident of Illinois, held a second mortgage against the real estate and an agreement, dated March 30, 1929, of said Bank. Her pleadings included a cross-complaint. The decree was that the Bank's mortgage be foreclosed and the proceeds applied to, in the order named, the discharge of the indebtedness due plaintiff, the discharge of the indebtedness due Anna Sellner, and the remainder, if any, to Amos W. Dana. Anna Sellner appealed. The litigants state the case turns on the instrument of March 30, 1929, and, consequently, we eliminate collateral issues. A proper perspective for an equitable determination of the issues calls for a narrative of the essential facts.

Dr. Amos W. Dana was and is a resident of Burlington, Iowa. He held title to approximately 330 acres of land in Iowa and 390 acres in Marion county, Missouri. About June, 1923, of the Missouri real

estate forty acres secured a $2500 indebtedness due E. Webbles; 150 acres secured an unpaid balance of the purchase price of $9500 due Anna Sellner; and 202.4 acres secured an indebtedness of $11,000 and also a second indebtedness of $7,000 due said Bank. The aforesaid $18,000 was further secured by a mortgage on said Iowa lands, subject to a prior encumbrance securing $31,000 due said Bank. Dr. Dana desired to improve the Missouri real estate, tile it, etc. He requested the Bank to advance the necessary funds. The Bank was willing to advance a part but not all of the estimated amount (between $14,000 and $15,000) necessary for carrying out Dr. Dana's plans. Dr. Dana conceived the idea that if he could secure the consent of Anna Sellner to accept, after the completion of the improvements, an encumbrance on all the Missouri land subordinate to an encumbrance in favor of the Bank in lieu of her first mortgage on the 150 acres, he could make the necessary arrangements with the Bank. He took the matter up with Mr. Sellner, and secured Mrs. Sellner's consent to accept a new mortgage upon all the Missouri land subordinate to a mortgage securing $26,500 due the Bank upon the completion of the plans. Dr. Dana communicated the results of his negotiations with the Sellners to the Bank, and was informed the Bank would lend $36,000 on the Iowa land and $30,000 on the Missouri land. The improvements were completed and, among other things, the Webbles' debt was discharged. It appears that the Bank or its representative undertook to attend to the details of the transactions, including the necessary steps for the protection of Anna Sellner's interest. At the time of drafting the papers, the Bank's representative telephoned Dr. Dana at his office and obtained his consent to secure the $66,000 indebtedness due the Bank by a mortgage covering the Iowa and Missouri lands. Anna Sellner had no knowledge of and did not consent to any modification of her understanding with Dr. Dana. The note evidencing the $66,000 due the Bank was dated June 8, 1923, payable five years after date, and was secured by a mortgage of even date on the Iowa and Missouri lands. The mortgage was recorded in Marion county, Missouri, on June 11, 1923. The note evidencing the $9,500 due Anna Sellner was dated June 9, 1923, payable six years after December 31, 1922, and was secured by a mortgage on the Missouri land of even date and was acknowledged as of said date; but this mortgage was not recorded until April 2, 1927. Dr. Dana testified he advanced to the Bank the necessary money for recording the two mortgages. No mention is made in the $9,500 mortgage with respect to its being subject to any prior encumbrance. These papers were all part of one transaction. Mr. Boudreau, a lawyer, employed by the Sellners, ascertained, in 1927, that the $9,500 Sellner mortgage had been recorded recently and was subject to a prior encumbrance in favor of the Bank in the sum of $66,000 instead of $26,500. He, on behalf of Mrs. Sellner, immedi-

ately presented these facts to Dr. Dana and the Bank. The controversy thus produced was finally adjusted in 1929 in connection with the granting of a five years' extension to Dr. and Mrs. Dana for payment. Dr. and Mrs. Dana paid $1,000 on the Sellner indebtedness and executed a new note for $8500, dated December 31, 1928, payable on or before June 9, 1933, to Anna Sellner and secured same by a mortgage on the Missouri land, expressly subject to the prior $66,000 mortgage due the Bank. This mortgage was acknowledged April 10, 1929, and recorded April 16, 1929. The $9500 note bears the endorsement: "Assigned . . . this 12th day of April, 1929, for release of record. Anna Sellner." Written across its face is: "Paid by new note dated December 31, 1928." We understand the difference in the dates arose from Mrs. Sellner's refusal to act until a satisfactory adjustment was had of the prior subordination of her claim to the Bank's $66,000 mortgage in lieu of a mortgage securing only $26,500. As a part of said transaction, the Bank executed and delivered to Mrs. Sellner the agreement, dated March 30, 1929, upon which the parties state the case turns. After "whereas" clauses stating, among other things, that the Bank held a mortgage on the Missouri land securing $66,000; that the parties thereto desired to extend said indebtedness for a term of five years; that Mrs. Sellner held "a second mortgage" on said Missouri land securing $8500, and that Dr. Dana was desirous of renewing said $8500 indebtedness for a term of five years, said instrument reads: ". . . which renewal or extension the said Mrs. Anna Sellner is willing to grant upon certain conditions as hereinafter set out;

"Now, therefore, in consideration of the acceptance of Mrs. Anna Sellner, of a mortgage or a deed of trust upon the said real estate in Marion county, Missouri, subject to the said mortgage to the American Savings Bank and Trust Company of Burlington, Iowa, renewed and extended as above and in further consideration of the sum of One Dollar ($1.00) to it in hand paid by the said Mrs. Anna Sellner, the receipt whereof is hereby acknowledged, the said American Savings Bank & Trust Company of Burlington, Iowa, does hereby agree to and with the said Mrs. Anna Sellner that should it become necessary to and the undersigned begins to foreclose its said mortgage upon the real estate in Marion county, Missouri, or in case the said note to the said Mrs. Anna Sellner is not paid upon maturity, then the said Bank agrees that it will, at the request of the said Mrs. Anna Sellner, or her assigns, take up·by assignment to it the said note and mortgage or deed of trust at the amount of the unpaid balance of the principal and accrued interest thereof and thereon."

The American Savings Bank and Trust Company became insolvent and passed into receivership June 16, 1932.

On or about March 15, 1933, Anna Sellner filed a claim in the insolvency proceedings of said Bank, setting forth said $8500 note

and said instrument of March 30, 1929. This claim was allowed in the sum of $9257.80 as a general creditor's claim.

On February 6, 1933, plaintiff obtained a judgment against Dr. and Mrs. Dana for $74,694.74 in the District Court of Iowa for Des Moines County, and a decree that the mortgage on the Iowa land be foreclosed. The foreclosure proceedings resulted in a credit of $12,368.09 and a balance $62,326.65 unpaid on said $66,000 note.

The instant suit was instituted on May 29, 1933.

Mrs. Sellner's contentions embrace the position that under the instrument of March 30, 1929, and the facts involved she, in equity, is entitled to priority of payment over the Bank out of any proceeds derived from the real estate by reason of the mortgages to the Bank and to Mrs. Sellner.

Respondent says the instrument does not provide that the Bank shall pay the $8500 Dana note; that it does not expressly provide that the Bank "take up" said note as a condition precedent to foreclosure or that, upon the Bank's failure to take up said note, the order of priority of the mortgages to the Bank and Mrs. Sellner should be reversed; that the mortgage to Mrs. Sellner and said instrument expressly state that said mortgage is subordinate to the mortgage to the Bank; that the purpose of said instrument was to have Mrs. Sellner recognize the priority of the mortgage to the Bank; and respondent concludes that said instrument imposed only a personal obligation on respondent to take up the $8500 Dana note, which personal obligation Mrs. Sellner accepted in compromise and settlement of her then claimed rights, and she, in equity, possesses no rights against said real estate superior to the Bank's.

Respondent, to sustain its construction of the instrument, cites authorities to the following effect: "Courts cannot write provisions into contracts not written by the parties to them. They can only enforce agreements as written." [Blanke Bro. Realty Co. v. American Surety Co. (Banc), 297 Mo. 41, 54, 247 S. W. 797, 801; Liggett v. Levy, 233 Mo. 590, 601, 136 S. W. 299, 302[4], Ann. Cas. 1912C, 70.] And ". . . the principle that all prior and contemporaneous oral agreements are merged into the written contracts." [Douglass v. Hammel, 313 Mo. 514, 524, 285 S. W. 433, 435(7); Wright v. Great Eastern Casualty Co. (Mo. App.), 206 S. W. 428, 429(2).] They, however, are not this case.

That mortgagees may validly contract with regard to their respective rights is not controverted. [Brown v. Barber, 244 Mo. 138, 150, 148 S. W. 892, 895; 41 C. J., p. 512, sec. 448; 42 C. J., p. 36, sec. 1538.]

The Bank invokes the aid of a court of equity. A governing principle of equity finds expression in the maxim: He who seeks equity must do equity. "The meaning is, that whatever be the nature of the controversy between two definite parties, and whatever be the

nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject-matter of the controversy." [1 Pomeroy's Equity Jurisprudence (4 Ed.), sec. 385.] And ". . . where the granting of relief raises equitable rights in favor of defendant, the according of such rights will be imposed as a condition of granting the relief." [21 C. J., p. 174, sec. 152 and see n. 19a.] "This principle is not confined to any particular kind of equitable rights and remedies, but pervades the entire equity jurisprudence, so far as it is concerned with the administration of equitable remedies." [1 Pomeroy, Ibid, sec. 388.] Chesapeake & O. Ry. Co. v. Dayton, 177 Ky. 502, 512, 197 S. W. 969, 973, states: "the party who, by his voluntary act, has put it out of his power to fulfill the terms of the contract, may be compelled, by appropriate action, to either respond in damages for his breach, or, if the other party is willing may, in a court of equity be compelled to perform the contract in some practicable way that will be satisfactory to the other party and at the same time will carry out the purpose and spirit to the contract." [Mayflower Realty Co. v. Security Savings & Loan Soc., 192 Wash. 129, 133, 72 Pac. (2d) 1038, 1039; Rector of St. David's v. Wood, 24 Ore. 396, 34 Pac. 18, 41 Am. St. Rep. 860. Consult Whelan v. Reilly, 61 Mo. 565, 569(4).]

The material portion of the instrument of March 30th here involved is: ". . . should it become necessary to and the undersigned [Bank] begins to foreclose its said mortgage upon the real estate in Marion county, Missouri, . . . then the said Bank agrees that it will . . . take up by assignment to it the said [Sellner] note and mortgage . . . at the amount of the unpaid balance of the principal and accrued interest thereof and thereon." This instrument is interwoven with the mortgages to the Bank and to Mrs. Sellner. It refers to them and without a consideration of them is not understandable. The purpose of said instrument, from Mrs. Sellner's viewpoint as contradistinguished from the Bank's viewpoint, was to protect Mrs. Sellner by having the Bank "take up by assignment," purchase or buy the $8,500 note, paying therefor the principal and interest then due. The Bank's obligation was not an assumption of the Dana indebtedness due Mrs. Sellner, or in the event of or after foreclosure to purchase said note. Its obligation matured, not when the Bank consummated foreclosure but, when the Bank first sought the aid of a court of equity to foreclose. Upon the Bank's institution of foreclosure proceedings and prior to their consummation Mrs. Sellner's rights accrued. Mrs. Sellner's covenant to recognize the priority of the Bank's mortgage involved the Bank's corresponding covenant to "take up" the $8500 note. Had the Bank

remained solvent Mrs. Sellner's action on the Bank's covenant would have afforded relief. The Bank's insolvency and receivership intervened, preventing the Bank's performance. This was personal to the Bank; and the Bank's inability to perform, in law, is chargeable against the Bank. Bona fide contracting parties contemplate performance. Equity imputes an intention to fulfill an obligation. [21 C. J., p. 206, sec. 206.] The United States Supreme Court has remarked: "In sort, it must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance . . ." [Central Trs. Co. v. Chicago Auditorium Assn., 240 U. S. 581, 591, 36 Sup. Ct. 412, 415, 60 L. Ed. 811, 815. Consult Wimer v. Wagner, 323 Mo. 1156, 1167, 20 S. W. (2d) 650, 653, 79 A. L. R. 1231.] Since equity regards the substance rather than the form (21 C. J., p. 204, secs. 199 et seq.), the Bank's obligation to "take up" should the Bank "begin to foreclose" carried an implied obligation to refrain from consummating foreclosure until after the Bank purchased. The wording of the Bank's obligation does not contemplate the consummation of foreclosure prior to the maturity of its obligation to purchase. The parties had in mind performance by the Bank prior to the consummation of foreclosure under the Bank's mortgage. This construction gives business efficacy to the contract as written. It gives the contract that effect which the parties apparently did agree upon and that effect which, as fair and reasonable men, they, in equity, presumably would have agreed explicitly upon if, having in mind the possibility of the Bank's insolvency, they had contracted expressly in reference thereto. Had the Bank performed its obligation to Mrs. Sellner and thereafter passed into the hands of a receiver, its assets available for distribution would have been extinguished to the extent of its payment to Mrs. Sellner and a decree of foreclosure charging the proceeds with the discharge of the Bank's obligation to Mrs. Sellner would place the creditors of the Bank in no worse plight than had performance occurred prior to the insolvency.

The note and mortgage due Mrs. Sellner carried provisions for reasonable attorney fees in the event of suit; but the instrument of March 30, 1929, obligated the Bank only with respect to the principal and interest due Mrs. Sellner.

The foregoing disposes of the controverted issues briefed by the litigants with respect to the effect of said instrument of March 30, 1929, and covers the relief to which we think Mrs. Sellner is entitled in equity under the record made.

We therefore set aside the decree and judgment *nisi* and remand the cause with the following directions: That such steps as may be necessary and proper for the consummation of the foreclosure of the Bank's mortgage be had; that all necessary and proper ac-

countings be taken and that the net proceeds therefrom, if any, together with the proceeds derived from the foreclosure proceedings be applied to, in the order named, the reimbursement to the Bank of advancements to discharge liens superior to said mortgages; the discharge of the Bank's obligation under the instrument of March 30, 1929, to Mrs. Sellner—the payment of said $8500 note and accrued interest; the discharge of the indebtedness secured by the Bank's mortgage; the payment of attorney fees incurred on behalf of Mrs. Sellner in accord with said $8500 note and mortgage securing the same, and the remainder to Amos W. Dana. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.